## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## DELTA DIVISION

ADAM GROSCH,

Plaintiff,

vs.                                             CIVIL ACTION NO.2:06cv204-P-A

TUNICA COUNTY, MISSISSIPPI,
TUNICA COUNTY DEPUTY SHERIFF DORNAE MOSBY,
HWCC-TUNICA, INC., AND
HOLLYWOOD CASINO CORPORATION,

Defendants.

## SECOND AMENDED COMPLAINT

### Jury Trial Demanded

This civil action arises from the December 11, 2005, arrest of plaintiff Adam Grosch at the Hollywood Casino in Tunica County, Mississippi after he declined to show his identification to a casino employee. This action is brought pursuant to 42 U.S.C. §1983, the United States Constitution, and the laws of the State of Mississippi, including the Mississippi Tort Claims Act, Miss. Code § 11-46-1 et seq.

### JURISDICTION

1.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332, and 1343, and 42 U.S.C. § 1983.  Also, the supplemental jurisdiction



**EXHIBIT**

"A"

of this Court to hear claims arising under state law is invoked pursuant to 28 U.S.C. §1367. Venue is appropriate under §1391 (b) and §1392.

## PLAINTIFF

2.     The plaintiff, Adam Grosch, is an adult resident citizen of Durham, North Carolina.

## DEFENDANTS

3.     Defendant Tunica County, Mississippi, is a unit of local government in the State of Mississippi.

4.     Deputy Dornae Mosby is an officer with the Tunica County Sheriff's Department. At all times pertinent to this complaint, he was acting in the course and scope of his employment and under the color of law. His actions as set forth in this complaint were in reckless disregard of the safety and well-being of the plaintiff, who was not engaged in criminal activity.

5.     Defendant HWCC-Tunica, Inc., is a Texas Corporation, authorized to do business in Mississippi, and may be served with process by service upon its registered agent C T Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi, 39232. At the times set forth in this complaint, HWCC-Tunica, Inc. owned and operated the Hollywood Casino in Tunica County, Mississippi. At various times described in this complaint, HWCC-Tunica, Inc.

2

acted jointly with the other defendants to deprive the plaintiff of rights protected by the federal and state constitutions. In so doing, it acted under color of law. It is liable for the actions of Hollywood Casino personnel in this case.

6.      Defendant Hollywood Casino Corporation is a Pennsylvania corporation registered to do business in Mississippi and may be served with process by service upon its registered agent C T Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi, 39232. Hollywood Casino Corporation developed the Hollywood Casino in Tunica County, Mississippi, and owns the stock of Defendant HWCC-Tunica, Inc.   At the relevant time, Hollywood Casino Corporation played a role in operating the Hollywood Casino in Tunica County through its subsidiary HWCC-Tunica, Inc.   At various times described in this complaint, the Hollywood Casino Corporation acted jointly with the other defendants to deprive the plaintiff of rights protected by the federal and state constitutions. In so doing, the Hollywood Casino Corporation acted under color of law. It is liable for the actions of Hollywood Casino personnel in this case.

## FACTUAL ALLEGATIONS

7.      On December 11, 2005, plaintiff Grosch was a patron of the Hollywood Casino in Tunica County, Mississippi.   While he was playing

blackjack, he was asked to withdraw from the game and was told that he would need to leave the casino and could not return.  Apparently casino employees believed the plaintiff was using a card counting strategy.  This sort of strategy is not illegal.

8.    Plaintiff Grosch agreed to leave the casino immediately, but was told by a casino employee that if he left without cashing in his chips, he would not be allowed to return to the casino to do so.  The plaintiff then informed the casino staff that he would go directly to the cage, cash in his chips, and then leave the premises and not return.  When the plaintiff presented his chips to the cashier, the casino employee ordered the cashier not to cash the chips and so the plaintiff was not given his money.  Casino officials asked the plaintiff for his identification, but he declined to provide it.  The plaintiff had a right to refuse to provide them with his identification. (Upon information and belief, the casino was requesting the identification so they could share it with other casinos as part of their collective effort to maximize their gambling advantage by blackballing those who they think are able to count cards and minimize the advantage). The plaintiff then asked that the Mississippi Gaming Commission be contacted.

9.  Casino officials then contacted the Tunica County Sheriff's Department, falsely told the Sheriff's Department that the plaintiff was refusing to leave, and

4

asked that an officer be sent to arrest the plaintiff. Deputy Dornae Mosby with the Tunica County Sheriff's department arrived. Without asking the plaintiff any questions about the situation at hand, the deputy ordered the plaintiff to show him his identification. The plaintiff responded that he would show the deputy his identification but that he did not want it to be given to the casino. The plaintiff was arrested for disorderly conduct.

10.    Rather than take the plaintiff to the jail, the deputy took the plaintiff to a security holding room in the Hollywood Casino. The deputy emptied the plaintiff's pockets, took the plaintiff's identification, and turned over the identification to Hollywood Casino personnel. The deputy also allowed the casino to make a photocopy of plaintiff's identification.

11.    The plaintiff was then transferred to the Tunica County Jail for booking, where he posted a $500 cash bond for his release. After being arrested, and immediately prior to being transferred to the jail, the casino finally gave the plaintiff his money.

12.    The criminal charge of disorderly conduct against the plaintiff was set for trial but then dismissed on the date of trial.

13.    The plaintiff had a right to decline to show identification to the casino officials. He committed no crime and there was no probable cause to arrest him.

14.     Tunica County has failed to properly train and supervise its law enforcement officers.

13.     As a result of the unlawful detention and arrest, as well as the refusal of the casino to give the plaintiff the money he was owed when he initially requested it, the plaintiff was deprived of his freedom and his property and he suffered damages.  These damages were caused by the events and conditions listed in this complaint.

14.     A notice of claim has been filed pursuant to the provisions of the Mississippi Tort Claims Act.

VIOLATIONS

COUNT ONE

15.     The plaintiff was arrested without probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution.    All defendants are liable, including the Hollywood Casino Corporation, which acted jointly with other defendants in causing the arrest of the plaintiff.

COUNT TWO

16.     The plaintiff's rights under Mississippi common law, tort law, and constitutional law were violated by the Hollywood Casino.  The wrongs inflicted upon the plaintiff by the casino include trespass to chattels, conversion, false

arrest, false imprisonment, abuse of process, malicious prosecution, and violation of his rights under the Mississippi Constitution.

COUNT THREE

17.  The plaintiff's rights under Mississippi common law, tort law, and constitutional law were violated by Deputy Mosby, and the County is responsible for this under the Mississippi Tort Claims Act.  The wrongs inflicted by Deputy Mosby include false arrest, false imprisonment, malicious prosecution, and violation of the plaintiff's rights under the Mississippi Constitution.

RELIEF

18.  Wherefore, the plaintiff demands a jury trial on all but the Mississippi Tort Claims Act claims, for which he requests a judge trial as required by that statute (Miss. Code § 11-46-13(1)), and upon a verdict in his favor, asks that compensatory damages be assessed in an appropriate amount, as well as punitive damages for those claims for which they are available by law, and that he be awarded costs, attorneys fees, and all other relief to which he is entitled.

Respectfully Submitted,
s/Robert B. McDuff
ROBERT B. McDUFF,
Miss. Bar #2532
767 North Congress Street
Jackson, Mississippi  39202
(601) 969-0802
(601) 969-0804 (fax)
RBM@McDufflaw.com

A. RANDALL HARRIS
Miss. Bar # 1975
P.O. Box 2332
Madison, MS  39130
(601) 454-7242
(601) 968-6441 (fax)
RHarris51043@yahoo.com

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2007, I electronically filed the foregoing *Plaintiff's Second Amended Complaint* with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

John S. Hill
Mitchell, McNutt & Sams, P.A.
105 South Front Street
Post Office Box 7120
Tupelo, MS 38802

Alfred T. Tucker, III
Post Office Box 68
Tunica, MS 38678


s/Robert B. McDuff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

NO. 2:06CV204-P-A

ADAM GROSCH,

      PLAINTIFF

V.

TUNICA COUNTY, MISSISSIPPI, TUNICA COUNTY SHERIFF'S
DEPUTY DORNAE MOSBY, HWCC-TUNICA, INC., AND
HOLLYWOOD CASINO CORPORATION,

      DEFENDANTS

---

<u>DEPOSITION OF ADAM GROSCH</u>

Taken on Tuesday, October 16, 2007, at 12:55 p.m.,
in the offices of Tucker, Selden & Tucker,
Tunica, Mississippi

APPEARANCES:

      HONORABLE RANDY HARRIS
      767 North Congress Street
      Jackson, Mississippi 39202
         Attorney Representing Plaintiff

      HONORABLE JOHN S. HILL
      Post Office Box 7120
      Tupelo, Mississippi 38802

      HONORABLE A. THOMAS TUCKER, III
      Post Office Box 68
      Tunica, Mississippi 38676-0068
         Attorneys Representing Defendants

         Also Present:  Cindy Smart

REPORTED BY:

         KAREN C. REID, CSR 1276
          662-234-7804



COPY

EXHIBIT

"B"

1      A.      Yeah, I got a player's card.  I sat down to

2  play Blackjack and I got a player's card from them, and

3  I played for about 25 minutes and then left.

4      Q.      Okay.  And that's on the December 10?

5      A.      Uh-huh.

6      Q.      Where did you get your player's card?

7      A.      From --

8      Q.      From Hollywood.

9      A.      I got it from the table games supervisor,

10  pit boss, who is the woman who got me one of their

11  player's cards.

12      Q.      And how does that work?  Did you walk in

13  and go to the Blackjack table?

14      A.      I walked in, went to the Blackjack table,

15  bought in for chips and requested to be rated and they

16  got me a player's card.

17      Q.      Did you show your identification at that

18  point in time?

19      A.      Yeah.  When they asked -- it's typical when

20  you get rated to hand over your identification so they

21  can record your information, usually to send mailers

22  and other offers from the casino after you provide your

23  mailing address, and so at that point. I gave my ID

24  over and then got back my ID with the card, the

25  player's card.

1    A.    I don't know.  What is his name?

2    Q.    Then after you pick up your chips,

3  according to the your statement, you go to the cage to

4  try to cash them in; is that correct?

5    A.    That's correct.

6    Q.    And they won't cash them in?

7    A.    They refuse to give me my money.

8    Q.    An you testified that you did not show your

9  identification?

10    A.    Right.

11    Q.    And the Hollywood person in the suit stated

12  that he was going to call the police?

13    A.    That's after I requested for him to call

14  the Gaming Commission.

15    Q.    Did you hear him make the call to the

16  police?  Or did he call dispatch?

17    A.    He didn't make the call.  He called whoever

18  in the casino to make the call.

19    Q.    So you didn't actually hear the telephone

20  call to the police?

21    A.    No.  Or the Gaming Commission.

22    Q.    Shortly after that is when the police

23  arrive first, prior to the Gaming Commission agent?

24    A.    Correct.

25    Q.    Were you still standing at the cage?

Page 38

1    A.    Uh-huh.

2    Q.    Did you have your chips?

3    A.    I don't know if I had them or if they were

4    staying on the --

5    Q.    Counter?

6    A.    The counter.

7    Q.    But Hollywood had not taken them?

8    A.    No.

9    Q.    And that was the $925 in chips, I believe?

10   A.    Uh-huh.

11   Q.    And then the police arrived?

12   A.    Uh-huh.  Well, I mean, there was a lot of

13   interaction that happened.

14   Q.    When you say interaction, just --

15   A.    Especially with Lisa, the security officer.

16   At that point she had been requesting my

17   identification, too, and she said, "Well, this will

18   make it a lot easier on you if you will show your

19   identification.  This isn't really that big of a deal."

20   Q.    When you say interaction, you are talking

21   about verbal?

22   A.    Yeah.

23   Q.    And Lisa also requested your

24   identification?

25   A.    Uh-huh.

Page 45

1    I believe, in the report writing room, it was the

2    deputies and this Hollywood employee who was in normal

3    attire, not security uniform, and Lisa Ratliff, who is

4    the security officer?

5        A.    Uh-huh.

6        Q.    What else was said and done by the

7    Hollywood employees in that report writing room?

8        A.    Well, they took all my information.

9        Q.    Who did, the police officers or the

10   Hollywood?

11       A.    The Hollywood took all my information and

12   recorded all my information, photographed me, counted

13   all of my money, and at this point it was done in

14   conjunction with the Sheriff's Officers.

15       Q.    At that time did they see your

16   identification?

17       A.    Yes.  And had it physically.

18       Q.    Did the Police Department give them the

19   identification?

20       A.    That's right.

21       Q.    Did they cash in your chips at that time?

22       A.    No.  They didn't cash in my chips until the

23   very end right before I left.

24       Q.    But they cashed in your chips before you

25   were escorted off the premises?

Page 46

1    A.    Yep.

2    Q.    I'm sorry?  Is that a "yes"?

3    A.    Yep.

4    Q.    And that was the $925?

5    A.    Uh-huh.

6    Q.    And were you escorted from the premises by

7 the Sheriff's Department?

8    A.    From the premises directly into the

9 deputy's car.

10    Q.    Okay.  I'm winding up, Mr. Grosch.  I'm a

11 little longer than I expected.

12    A.    Okay.

13    Q.    Let me do a little cleaning up.  Let's

14 introduce that statement as No. 2, Mr. Grosch's written

15 statement that he prepared.

16              (DOCUMENTS MARKED AS EXHIBIT NO. 2.)

17              BY MR. HARRIS:  (Reviews.)

18    Q.    Okay.  I believe the Gaming Commission

19 Officer -- you testified you requested they call the

20 Gaming Commission?

21    A.    Uh-huh.

22    Q.    The Gaming Commission Officer arrived in

23 the report writing room?

24    A.    Uh-huh.

25    Q.    What was said to him by you?

Page 64

1       Q.      And I understand based on your testimony,

2    both from your counsel and Mr. Tucker, that you did not

3    hear the call made to the Sheriff's Office?

4       A.      That's right.

5       Q.      What is your best estimate as to how soon

6    after you were apprised that the Sheriff's Office had

7    been called was it before a Sheriff's Deputy arrived at

8    the scene?

9       A.      It seemed pretty quickly and like minutes

10   and it just seemed like it wasn't very long.

11      Q.      Did one officer arrive or did more than

12   one?

13      A.      More than one officer arrived.

14      Q.      How many?

15      A.      There were at least two.  Might have been

16   more.

17      Q.      To the best of your memory, then, at least

18   two officers arrived essentially simultaneously?

19      A.      Yes.

20      Q.      If you need to refer to the Second Amended

21   Complaint that Mr. Tucker was asking you about, please

22   do so.

23      A.      Uh-huh.

24      Q.      But you state in Paragraph 9 --

25      A.      Uh-huh.

Page 69

1    presently?

2         A.    Yeah, I would say so.  When they first

3    arrived, I was actually a little bit relieved that they

4    had arrived because I thought once they heard the story

5    of what was going on, they would take my side.

6         Q.    Why did you think that?

7         A.    Because I wasn't doing anything illegal,

8    and Hollywood was refusing to give me the money that I

9    had won from the casino.

10        Q.    As I listened to your testimony here just a

11   moment ago, I recall you stating that Officer Mosby

12   asked you twice to produce your identification.  Is

13   that your memory, that he asked you twice and not more

14   than twice?

15        A.    That's right.

16        Q.    Okay.  And did you at any time offer to

17   produce your identification to Officer Mosby?

18        A.    Yes.  I said, "I would be happy to show you

19   my ID, but I don't know want the casino personnel to

20   see it."

21        Q.    Where do you keep your identification?

22        A.    In my wallet.

23        Q.    At that time?

24        A.    Yes.

25        Q.    You keep your wallet in your back pocket?

Page 82

1  with me.  Throughout the whole time I really felt like

2  a criminal.

3       Q.     How long would you estimate that you were

4  at the jail facility?

5       A.     Hard to say.  It seemed like a reasonable

6  amount of time, whatever that would take.

7       Q.     Half hour?

8       A.     Less than an hour.

9       Q.     Okay.  Were you ever behind bars?

10      A.     No.

11      Q.     When you posted bail, did you pay a

12  bailbondsman or did they just accept your money?

13      A.     They accepted my money.

14      Q.     The $500?

15      A.     $500.  There was something -- it was $500

16  plus something, like $25 or something.

17      Q.     And after you posted bond, what happened?

18      A.     I got myself into the lobby of the jail

19  facility or whatever it was and started to wonder how I

20  was going to get back to get my car.

21      Q.     Okay.

22      A.     And I was told that I had permission to

23  return to the property in order to pick up my car from

24  the casino even though I had been 86ed.  And I ended up

25  calling the taxi company and then waited there for it,

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

NO. 2:06CV204-P-A

ADAM GROSCH,

       PLAINTIFF

V.

TUNICA COUNTY, MISSISSIPPI, TUNICA COUNTY SHERIFF'S
DEPUTY DORNAE MOSBY, HWCC-TUNICA, INC., AND
HOLLYWOOD CASINO CORPORATION,
       DEFENDANTS

---

<u>DEPOSITION OF DORNAE MOSBY</u>

Taken on Tuesday, October 16, 2007, at 3:46 p.m.,
in the offices of Tucker, Selden & Tucker,
Tunica, Mississippi

APPEARANCES:

    HONORABLE RANDY HARRIS
    767 North Congress Street
    Jackson, Mississippi 39202
       Attorney Representing Plaintiff

    HONORABLE JOHN S. HILL
    Post Office Box 7120
    Tupelo, Mississippi 38802

    HONORABLE A. THOMAS TUCKER, III
    Post Office Box 68
    Tunica, Mississippi 38676-0068
       Attorneys Representing Defendants

      Also Present: Adam Grosch, Cindy Smart

REPORTED BY:

       KAREN C. REID, CSR 1276
         662-234-7804



COPY

EXHIBIT
"C"

Page 18

1   standing at the door or not.

2       Q.      So you walked up and started talking to the

3   casino personnel?

4       A.      Yes.  Talked to casino personnel.

5       Q.      Do you know who it was you talked to?

6       A.      No, sir, sure don't.

7       Q.      Do you know if they were male or female?

8       A.      I can't remember.  I can't remember.  All I

9   know they advised me they wanted the subject 86ed off

10  the property.  And my reply is, you know, "Give me a

11  reason why."  And they explained to me and, therefore,

12  that's why Mr. Grosch, I explained to him the

13  situation.

14      Q.      So you walk in there and they tell you they

15  want this guy kicked off their property; is that right?

16      A.      No, they didn't say it in those words.

17      Q.      Well, what does 86ed mean?

18      A.      86ed is when you are permanently evicted

19  off the property.  You can't come back to the property

20  or you can't come back to a property that was -- that

21  is, you know, in reference to them, can't come back to

22  them.

23      Q.      So you just testified that you walked in

24  and started talking to the casino people?

25      A.      I spoke to security.

Page 19

1      Q.    To security.  And they wanted this guy 86ed

2  from the property?

3      A.    Yes.  And I had to find out what you are

4  86ed for.  I can't just kick him, escort him out,

5  without knowing the reason.

6      Q.    And what was the reason?

7      A.    The reason was that he was a professional

8  card counter.  He left Fitzgerald's, went there, and

9  they wanted him 86ed off the property.

10     Q.    Okay.  And what else do you remember

11  talking to them at that time about?

12     A.    They advised me they wanted him 86ed off

13  the property.

14     Q.    Okay.  So I assume that you walked straight

15  up to Mr. Grosch and say, "They want you off the

16  property; let's go"?

17     A.    No, sir.  I advised him that they wanted

18  Mr. Grosch to come to the back and, I guess, read him

19  the 86.  At the time he was there cashing chips.

20     Q.    Uh-huh.

21     A.    Then therefore, I advised him again.  Then

22  therefore, I asked for his identification.

23     Q.    You advised who?

24     A.    Mr. Grosch.  I'm sorry.

25     Q.    All right.

1      A.      Of his identification.

2      Q.      Okay.

3      A.      Just protocol, just us seeing do you have

4  any warrants or are you a murderer or anything of that

5  nature.  That's our protocol of the Sheriff's

6  Department just for our safety.  Then again, I advised

7  Mr. Grosch, you know, they, you know, want him to go to

8  the back.  He got loud, caused a scene.  Advised him

9  again several times.  Therefore, he refused.

10      Q.      Advised him again what?

11      A.      Advised they needed to see him in the back.

12  He got louder and louder, caused a scene.  Therefore, I

13  placed him into custody.

14      Q.      So you placed him into custody because he

15  got loud?

16      A.      Disorderly.  Yes, sir.

17      Q.      Disorderly?

18      A.      Caused a scene.  All the guests looking.

19  Caused a scene.

20      Q.      So your basis for -- I mean, was he under

21  arrest at that time?

22      A.      By me, yes, sir.  He was under arrest and

23  read his Miranda warnings.

24      Q.      So you placed him under arrest because he

25  was being loud?

Page 21

```
 1        A.      Yes, sir.

 2        Q.      And he wouldn't go into the back with them?

 3        A.      Yes, sir.

 4        A.      Well, I -- actually, the reason why I did

 5   it is I advised him several times.

 6        Q.      Of what, sir?

 7        A.      Of -- to, you know, to come to the back.

 8        Q.      Okay.  What is in the back?

 9        A.      The office, their office.

10        Q.      Okay.

11        A.      Where they do most of their paperwork.

12        Q.      Okay.  What business is it of the Sheriff's

13   Department or what business is it of you to take him

14   into the back of the casino?

15        A.      Well, what the casino does is they read him

16   the 86 warning.

17        Q.      Uh-huh.

18        A.      Which is you -- like I said previously, you

19   can't come back on the property.

20        Q.      Okay.

21        A.      Then therefore, thereafter I transported

22   him.  They read it out and he had large sums of money

23   on him.  We counted that, put it in the evidence bag,

24   dropped it.  Then he was transported to the Tunica

25   County Sheriff's Department after he was read his 86,
```

1    can't come back on the property.

2        Q.    Okay.  So they told you that a person had

3    been 86ed, and they wanted you to get him off the

4    property, but they hadn't even read him the 86 yet?

5        A.    They read him the 86.  They read him the 86

6    in the back of the office.

7        Q.    But before you got there, to your

8    knowledge?

9        A.    I can't say did they read him the 86 or

10    not.

11        Q.    Okay.  Is there a reason why they can't --

12    how long does it take to read a guy an 86?

13        BY MR. TUCKER:  Object to the form.  He has

14    no personal knowledge of what happened before he

15    arrived at Hollywood.

16        Q.    How long did it take them to read him the

17    86?

18        A.    About five minutes.

19        Q.    Okay.  Do you know of any reason why they

20    couldn't read it to him right there in front of the

21    cage?

22        BY MR. TUCKER:  A continuing objection.

23        A.    No, sir, I sure don't.

24        Q.    Do you know of any reason why they couldn't

25    come down to the Sheriff's Department and read him the

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

NO. 2:06CV204-P-A

ADAM GROSCH,

        PLAINTIFF

V.

TUNICA COUNTY, MISSISSIPPI, TUNICA COUNTY SHERIFF'S
DEPUTY DORNAE MOSBY, HWCC-TUNICA, INC., AND
HOLLYWOOD CASINO CORPORATION,

        DEFENDANTS

---

<u>DEPOSITION OF RICKY RAY</u>

Taken on Tuesday, October 16, 2007, at 5:05 p.m.,
in the offices of Tucker, Selden & Tucker,
Tunica, Mississippi

APPEARANCES:

    HONORABLE RANDY HARRIS
    767 North Congress Street
    Jackson, Mississippi 39202
        Attorney Representing Plaintiff

    HONORABLE JOHN S. HILL
    Post Office Box 7120
    Tupelo, Mississippi 38802

    HONORABLE A. THOMAS TUCKER, III
    Post Office Box 68
    Tunica, Mississippi 38676-0068
        Attorneys Representing Defendants

        Also Present: Adam Grosch, Cindy Smart

REPORTED BY:

        KAREN C. REID, CSR 1276
        662-234-7804



EXHIBIT

"D"

COPY

1      A.    And we explained to him that they wanted

2   him to leave, something about counting the cards,

3   knowing how to count the cards or whatever.

4      Q.    Okay.

5      A.    And so he got kind of loud and disorderly

6   with the officer, and I believe that's why he got

7   locked up, for disorderly conduct.

8      Q.    Okay.  But I guess my original question was

9   do you have a memory in this case, and if you don't,

10   that's fine, but how was it that you were dispatched to

11   the casino?

12      A.    By radio.

13      Q.    Okay.  By the radio?  And do you remember

14   what they told you?

15      A.    No, I can't remember what they told me.

16      Q.    Okay.  But, obviously, you went to the

17   Hollywood Casino?

18      A.    Yeah.

19      Q.    When you arrived at the casino, was

20   Deputy Mosby already there?

21      A.    Yes.

22      Q.    Okay.  Can you describe the first thing

23   that you saw or observed once you walked up to them,

24   where were they in the encounter?

25      A.    In front of the cage of the casino.

1      Q.      In front of the cage, okay.  And was

2   Mr. Grosch under arrest at that time?  Do you remember?

3      A.      No, I don't think, not at the time, but the

4   more he didn't cooperate with the officer about his ID,

5   that's what made him get under arrest.

6      Q.      So that's what your memory is?

7      A.      Yes.

8      Q.      Did you actually file any affidavits in

9   this particular case?

10     A.      No, sir.

11     Q.      Did you file or write out an offense

12  report?

13     A.      No, sir.

14     Q.      Okay.  So you're going today based on your

15  memory?

16     A.      Yes.

17     Q.      Okay.  And --

18     A.      He was the arresting officer so I didn't

19  have to write nothing.

20     Q.      Okay.  So tell us exactly what you saw

21  going on.

22     A.      Well, like I say, he was kind of upset

23  about him having to leave the casino.

24     Q.      Okay.

25     A.      And they said something about counting

1    been just security.

2         Q.    But you don't have an independent

3    recollection of who they were or if they identified

4    themselves or anything like that?

5         A.    No, I can't remember that.

6         Q.    Okay.  So basically you are saying as you

7    are walking up there, that's sort of the first thing

8    that you observed?

9         A.    Yes.

10        Q.    Okay.  All right.  And then after the

11   casino person asked him for an ID, you are saying

12   Deputy Mosby asked him for his ID?

13        A.    Yes, sir.

14        Q.    Okay.  Do you know why?

15        A.    Well, that's protocol.

16        Q.    Okay.

17        A.    We go on a call, if we don't know this --

18   just saying it's you.  We don't know if the subject

19   killed somebody or been into something, other than

20   that, could be a warrant.  We always ask for ID.

21        Q.    Okay.

22        A.    Then we run the ID to see if he got a

23   warrant or something like that.

24        Q.    Okay.  Did you do that in this particular

25   case?

1     are being arrested.  I know he had to sign that.

2          Q.     Okay.

3          A.     And he had two wallets.  Normally people

4     don't have two wallets, and I think he had cash in both

5     wallets.  I believe he had two ID's.  I'm not for sure,

6     but I believe he had two ID's.

7          Q.     And how would you know that?

8          A.     Because I was there.

9          Q.     Okay.  Well, did you take his ID out of his

10    wallet?

11         A.     I don't think so.

12         Q.     Okay.  Based on your memory, how would you

13    know that if you didn't do it?

14         A.     I was there right in the office with them.

15         Q.     Okay.  And if you know, how did his ID's

16    get out of his wallet if you know?

17         A.     I believe the officer took it out or we

18    asked him, one.  One of them.

19         Q.     And who was the officer?

20         A.     He was right there.

21         Q.     And who was the --

22         A.     Officer Mosby did, I think Mosby.

23         Q.     So you believed Officer Mosby took his ID

24    out?

25         A.     Or he asked him to take them out.



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

ADAM GROSCH,                                              Plaintiff

VS.                                          NO.: 2:06CV204-P-A

TUNICA COUNTY, MISSISSIPPI,
TUNICA COUNTY SHERIFF'S DEPUTY
DORNAE MOSBY, HWCC-TUNICA, INC., AND
HOLLYWOOD CASINO CORPORATION,                            Defendants

DEPOSITION

OF

LISA RATLIFF

OCTOBER 17, 2007

MICHELLE A. BROWN, CSR #1395
Post Office Box 797
Senatobia, Mississippi 38668
(662) 560-0144
dbrown04@comcast.net

EXHIBIT

"E"

1   Immediately before the deputy sheriff arrested Mr. Grosch,

2   did you have an opportunity to observe him, him being

3   Mr. Grosch?

4        A    Yes.

5        Q    Describe -- do you recall his demeanor -- I mean

6   it -- immediately prior to his arrest?

7        A    Yes, sir.

8        Q    Describe that for us, please.

9        A    He seemed to be getting loud, obnoxious, causing

10  a scene, demanding the gaming, refusing to show ID, not

11  cooperating.

12       Q    And how far away from Mr. Grosch and the police

13  officer -- the sheriff's deputy were you standing such

14  that you could observe that behavior?

15       A    I would say from myself to you.

16            MR. HILL:  Would you-all agree that's 6 to

17            10 feet?

18            MR. HARRIS:  6 feet.

19            MR. HILL:  6 feet.

20            MR. HARRIS:  6 feet.

21       Q    (By Mr. Hill)  Did you observed other persons in

22  the surrounding area, patrons, customers of the casino?

23  Did you notice whether Mr. Grosch's actions were drawing

24  attention?

25       A    I am sorry?

1     Q    Did you observe customers of the casino who were

2 there gaming -- whether Mr. Grosch's actions immediately

3 prior to his arrest were drawing their attention?

4     A    Yes, sir.

5     Q    And what did you observe in that respect?  You

6 did observe -- what did you see?  What did you observe?

7     A    I observed other guests that were around at

8 table games and walking by the cage and, also, cage

9 employees, you know, gawking.

10          MR. HILL:  Okay.  That's all the questions

11     I have.  Thank you, ma'am.

12          MR. TUCKER:  I don't have any questions.

13     Hang on one second.  Let me check.

14          (Brief pause.)

15          MR. TUCKER:  I don't have any questions.

16

17                  DEPOSITION CONCLUDED

18

19

20

21

22

23

24

25